## MEMORANDUM DECISION

Pursuant to Ind. Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.



FILED

Oct 19 2018, 9:56 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Alexander L. Hoover
Law Office of Christopher G. Walter, P.C.
Nappanee, Indiana

ATTORNEYS FOR APPELLEE

Curtis T. Hill, Jr.
Attorney General

Lyubov Gore
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

Ashley N. Sexton,

*Appellant-Defendant,*

v.

State of Indiana,

*Appellee-Plaintiff*

October 19, 2018

Court of Appeals Case No. 18A-CR-1020

Appeal from the Elkhart Circuit Court

The Honorable Michael A. Christofeno, Judge

Trial Court Cause No. 20C01-1610-F3-50

**Crone, Judge.**

# Case Summary

Ashley N. Sexton appeals her convictions and sentence for level 3 felony possession of methamphetamine and class A misdemeanor possession of a controlled substance. She argues that the trial court erred in admitting evidence allegedly obtained in violation of her right against unreasonable searches and seizures guaranteed by the Fourth Amendment to the United States Constitution. She also argues that her twelve-year aggregate sentence is inappropriate based on the nature of the offenses and her character. We conclude that the evidence was not seized in violation of her federal constitutional rights and that she fails to carry her burden to show that her sentence is inappropriate. Therefore, we affirm.

# Facts and Procedural History

On October 22, 2016, at approximately 12:30 a.m., Goshen Police Officers Mark Clere and Randy Valderrama were on patrol in an unmarked gray minivan. They drove to a Goshen church, which had twice previously reported the presence of unwanted homeless persons. As the officers entered the church parking lot, they observed a woman, later identified as Sexton, sitting in the front entryway. The officers parked in front of the sidewalk leading to the church entrance. Officer Kyle Kalb, who was driving a marked police car, parked next to the gray minivan. None of the officers activated their emergency lights or sirens.

[3]     The three officers, who were all in full police uniform, exited their vehicles and approached the entryway. Sexton stood up with a surprised expression and said something to another person, later identified as Eddy Moreno, who was standing in the corner of the entryway. Sexton appeared unsteady on her feet. Officer Clere asked Sexton for identification, while Officer Valderrama stepped away to talk separately with Moreno. Officer Kalb apparently went back and forth between the other two officers, but most of the time Officer Clere was alone with Sexton. Sexton knelt down to look for her ID. While she was looking through her black drawstring bag, she abruptly sat down. She was unable to locate her ID. However, she found her friend's ID and gave that to Officer Clere. She told Officer Clere her name was Ashley Baker, which was her maiden name, and provided her date of birth and the last four digits of her social security number.

[4]     Officer Clere observed that Sexton's eyes were red and glassy. She had trouble staying awake and told Officer Clere that she was getting sick and was ready to go home. Officer Clere detected the odor of synthetic marijuana and asked Sexton whether she had any narcotics. She replied that she did not and said that he probably smelled her drink. Officer Clere stated that he did not think the odor was from her drink because it was capped. Sexton stood up. Officer Clere asked Sexton whether she had anything illegal on her. Sexton told him that she had a taser and took it out of her jacket pocket and turned it on. Officer Clere told her to put it away. She apologized and put it in her bag. She sat down again. Officer Clere asked Sexton for her address and what her plans

for the rest of the evening were. Sexton told Officer Clere she was hungry because she had not eaten dinner that night and joked that she was on "fat girl status." State's Ex. 1. Officer Clere replied that he had not eaten dinner that night either because he had reported early for work.

[5] Officer Clere stood next to Sexton for several minutes as he observed Moreno interact with Officer Valderrama. Officer Clere then observed what appeared to be a hand-rolled cigarette on the sidewalk near where Moreno had been standing. Officer Clere picked it up and concluded that it was probably a synthetic marijuana cigarette. This prompted Officer Clere to again ask Sexton if she had any drugs on her. She said that she did not but volunteered that she did have some food. Officer Clere asked her if she would mind if he looked inside her bag. She said that she "didn't care." *Id.*

[6] Officer Clere opened the bag. Sexton asked him if her lighter was in there. Officer Clere told her he did not see her lighter. Among the items that officer Clere found in her bag was a digital scale with a white powdery substance on it. Based on his training and experience, Officer Clere believed that the white substance appeared to be methamphetamine. In his previous drug investigations, Officer Clere had found digital scales in conjunction with illegal narcotics and knew that they were used for weighing drugs to be sold. When he took it out of the bag, Sexton told Officer Clere that she was "carrying [the scale] for somebody else." *Id.* Officer Clere put the scale and the synthetic marijuana cigarette aside and requested that Sexton stand up and not put her hands in her pockets. As Sexton started to stand up, she immediately put her

hands in her pockets. Officer Clere asked her to remove them, and she did. He asked her if she had anything that would harm him. She said that she had a knife in her back pocket, which Officer Clere removed. Sexton put her hands in her jacket pockets again, so Officer Clere took hold of her arm to remove her hand from her pocket. He proceeded to pat down Sexton and felt an object in her right front jacket pocket. Officer Clere removed the object and found that it was a clear plastic bag containing a crystal-like substance, which Officer Clere believed to be methamphetamine. In the same jacket pocket, Officer Clere also found a small clear green bag that contained a crystal-like substance.

[7] Officer Clere handcuffed Sexton and informed her of her *Miranda* rights. Sexton acknowledged her rights and indicated that she was willing to answer questions. Officer Clere asked her about her drug use, and Sexton replied that she had smoked the night before. Officer Clere then did a thorough search of Sexton and found a wallet that contained a small clear plastic bag with white pills inside. Sexton informed Officer Clere that she had just gotten divorced and that her married name was Sexton. The police arrested Sexton and took her to jail.

[8] Testing revealed that the crystal-like substance in the clear bag was 28.18 grams of methamphetamine, and the crystal-like substance in the green bag was 1.79 grams of methamphetamine. One of the white pills from the plastic bag in Sexton's wallet was found to be Oxycodone, a schedule II controlled substance. The State charged Sexton with level 3 felony possession of methamphetamine, class A misdemeanor possession of a controlled substance, and class C misdemeanor possession of paraphernalia. Sexton filed a motion to suppress all

the evidence, arguing that it was obtained as a result of an unconstitutional search and seizure.

[9] After several continuances, Sexton's jury trial was scheduled for November 6, 2017. On November 6, the trial court empaneled the jury, provided preliminary instructions, and permitted the parties to present opening argument. The trial court then held a hearing on Sexton's motion to suppress and took the matter under advisement. The trial court dismissed the class C misdemeanor possession of paraphernalia charge on motion of the State. The following morning, the trial court issued an order denying her motion to suppress and proceeded with the jury trial. Sexton failed to appear in person either day. She was tried in absentia, and the jury found her guilty as charged.

[10] In March 2018, the trial court held a sentencing hearing. The trial court found that Sexton's and her counsel's statements regarding her drug addiction were mitigating factors. The trial court found the following aggravating factors: (1) Sexton's prior criminal history and pending case for resisting law enforcement and false informing; (2) she was on probation when she committed the instant offenses; (3) she previously violated probation four times; (4) she failed to appear two times in her case and at her trial; (5) she had used methamphetamine since 2005, had progressed to daily use, and was using methamphetamine when she failed to appear for trial; (6) she uses marijuana daily and also uses Adderall; (7) her illegal drug use comprises separate and distinct crimes each time she uses, showing a complete disregard for the law; (8) she is a high risk to reoffend; and (9) other forms of sanctions had proven

unsuccessful. Tr. Vol. 3 at 92-94; Appellant's App. Vol. 2 at 96-98. The trial court sentenced Sexton to twelve years with three years suspended for the level 3 felony conviction and to a concurrent term of one year for the class A misdemeanor conviction. This appeal ensued.

# Discussion and Decision

## Section 1 – The trial court did not err in admitting evidence.

[11] Sexton argues that the trial court erred in admitting evidence seized from the searches of her black drawstring bag and her person because it was seized in violation of her right against unreasonable searches and seizures guaranteed in the Fourth Amendment to the United States Constitution.[1] "When reviewing a trial court's ruling on the admissibility of evidence resulting from an allegedly illegal search, we do not reweigh the evidence, and we consider conflicting evidence most favorable to the trial court's ruling." *Conn v. State*, 89 N.E.3d 1093, 1097 (Ind. Ct. App. 2017), *trans. denied* (2018). However, the constitutionality of a search or seizure is a pure question of law that we review de novo. *Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014).

[12] The Fourth Amendment states,

---

[1] Although Sexton refers to Article 1, Section 11 of the Indiana Constitution in her brief, she does not make a separate state constitutional argument. Therefore, she has waived any state constitutional claim. *See Abel v. State*, 773 N.E.2d 276, 278 n.1 (Ind. 2002) (concluding that when appellant presents no authority or independent analysis supporting the separate standard of the state constitution, the state constitutional claim is waived).

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

"The fundamental purpose of the Fourth Amendment 'is to protect the legitimate expectations of privacy that citizens possess in their persons, their homes, and their belongings.'" *Hines v. State*, 981 N.E.2d 150, 153 (Ind. Ct. App. 2013) (quoting *Trotter v. State*, 933 N.E.2d 572, 579 (Ind. Ct. App. 2010)). This protection has been extended to the states through the Fourteenth Amendment to the United States Constitution. *Krise v. State*, 746 N.E.2d 957, 961 (Ind. 2001). In general, the Fourth Amendment prohibits searches and seizures conducted without a warrant supported by probable cause. *Clark v. State*, 994 N.E.2d 252, 260 (Ind. 2013). As a deterrent mechanism, evidence obtained without a warrant is not admissible in a prosecution unless the search or seizure falls into one of the well-delineated exceptions to the warrant requirement. *Id*. "Where a search or seizure is conducted without a warrant, the State bears the burden to prove that an exception to the warrant requirement existed at the time of the search or seizure." *Brooks v. State*, 934 N.E.2d 1234, 1240 (Ind. Ct. App. 2010), *trans. denied* (2011).

[13] Encounters between law enforcement officers and citizens take a variety of forms, not all of which implicate the protections of the Fourth Amendment. *Clark*, 994 N.E.2d at 261. Consensual encounters in which a citizen voluntarily

interacts with an officer do not implicate the Fourth Amendment. *Id*.
However, nonconsensual encounters do, and such encounters typically involve
one of two levels of detention: a full arrest lasting longer than a short period of
time, or a brief investigative stop. *Id*. The former requires probable cause to be
permissible; the latter requires a lower standard of reasonable suspicion. *Id*.

[14] Sexton argues that the officers conducted an investigative detention without
reasonable suspicion of criminal activity and that her consent to search her bag
was invalid. Accordingly, she asserts that any evidence discovered as a result of
her unlawful detention must be excluded as "fruit of the poisonous tree." *See*
*Segura v. United States*, 468 U.S. 796, 804 (1984) (noting that exclusionary rule
encompasses both "primary evidence obtained as a direct result of an illegal
search or seizure" and any "evidence later discovered and found to be
derivative of an illegality.") This includes the digital scale found in her bag as
well as the methamphetamine discovered during the pat down and the
Oxycodone discovered by the search after she was handcuffed and informed of
her *Miranda* rights.

[15] The State counters that the trial court properly admitted evidence that the
officers obtained as a result of a consensual encounter with Sexton and a
consensual search of her bag. We note that Sexton does not challenge the pat
down search that revealed the methamphetamine. Further, the State asserts,
and Sexton does not dispute, that once Officer Clere discovered the digital scale
with suspected methamphetamine residue on it, he had probable cause to arrest
Sexton for a felony, and therefore could search her and her belongings incident

to that arrest. *See Thomas v. State*, 81 N.E.3d 621, 625 (Ind. 2017) ("An officer may, however, arrest a suspect without a warrant if he observes the suspect committing a crime, or if the officer has probable cause to believe that the suspect has committed a felony."). Thus, we focus on the nature of the encounter until Officer Clere discovered the digital scale.

[16] Determining whether an encounter is consensual or involves some level of detention "turns on an evaluation, under all the circumstances, of whether a reasonable person would feel free to disregard the police and go about his or her business." *Clark*, 994 N.E.2d at 261 (quoting *Finger v. State*, 799 N.E.2d 528, 532 (Ind. 2003)). The test is an objective one; the question is not whether the particular person actually felt free to leave, but whether the officer's words and actions would have conveyed to a reasonable person that he or she was free to leave. *Id*. "Only when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen may we conclude a 'seizure' has occurred." *Clarke v. State*, 868 N.E.2d 1114, 1118 (Ind. 2007) (quoting *Florida v. Bostick*, 501 U.S. 429, 434 (1991)). Circumstances that might lead a reasonable person to believe that he or she was not free to leave include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Clark*, 994 N.E.2d at 261-62 (quoting *Overstreet v. State*, 724 N.E.2d 661, 664 (Ind. Ct. App. 2000), *trans. denied)*. "[M]ere police

questioning does not constitute a seizure." *Clarke*, 868 N.E.2d at 1118 (quoting *Bostick*, 501 U.S. at 434).

[17] Here, although there were three officers involved, none of them activated their sirens or lights when they parked at the church. There is no evidence that they approached Sexton in a threatening manner or displayed their weapons. Officer Clere spoke to Sexton while Officer Valderrama stepped away with Moreno and did not interact with Sexton. Our review of Officer Clere's body camera video reveals that he calmly requested Sexton's identification and engaged her in conversation in a pleasant manner. Officer Clere did not order her to do anything or use language or a tone of voice that would indicate that Sexton's compliance would be compelled. Sexton moved freely about during their conversation. Officer Clere did not physically touch or restrain Sexton. When she revealed her taser, he merely asked her to put it away. When Officer Kalb was present, his speech and behavior was similar to Officer Clere's. Officer Clere asked Sexton if she would mind if he looked in her bag, and she stated that she "didn't care." State's Ex. 1. Based on an evaluation of all the circumstances, we cannot say that the officers' words or actions would convey to a reasonable person that she was not free to disregard the officers and go about her business. Accordingly, we conclude that her encounter with the officers was consensual. *See Rutledge v. State*, 28 N.E.3d 281, 290 (Ind. Ct. App. 2015) (concluding that initial encounter was consensual where police did not activate lights or siren, approached the parked car, did not display weapons, and did not touch Rutledge); *Cochran v. State*, 843 N.E.2d 980, 984 (Ind. Ct.

App. 2006) ("Asking questions is an essential part of police investigations. In the ordinary course a police officer is free to ask a person for identification without implicating the Fourth Amendment.") (quoting *Hiibel v. Sixth Judicial Dist. Ct. of Nevada, Humboldt Cty.*, 542 U.S. 177, 185 (2004)), *trans. denied*; *Overstreet*, 724 N.E.2d at 663 (concluding that no stop or seizure occurred where officer stopped at a gas station without activating lights or siren, approached Overstreet while he was putting air in his tires, asked him for identification, and questioned him about what he had been doing).

[18]     We note that Sexton does not dispute that she consented to a search of her bag, but rather argues that her consent was invalid because she was not informed of her right to counsel prior to the search pursuant to *Pirtle v. State*, 263 Ind. 16, 323 N.E.2d 634 (1975).  However, *Pirtle* applies only when a person is in custody, which is defined as a "formal arrest' or a 'restraint on freedom of movement of the degree associated with a formal arrest.'"  *Meredith v. State*, 906 N.E.2d 867, 873 (Ind. 2009) (quoting *Luna v. State*, 788 N.E.2d 832, 833 (Ind. 2003)).  Given that we have concluded that her encounter with the police was consensual, it follows that she cannot have been in custody for *Pirtle* purposes. We conclude that the evidence found in Sexton's bag and on her person was not obtained in violation of her federal constitutional rights, and thus the trial court did not err in admitting the evidence.  Accordingly, we affirm Sexton's convictions.

## Section 2 – Sexton has failed to carry her burden to show that her sentence is inappropriate.

[19]   Sexton asks us to reduce her twelve-year sentence pursuant to Indiana Appellate Rule 7(B), which states, "The Court may revise a sentence authorized by statute if, after due consideration of the trial court's decision, the Court finds that the sentence is inappropriate in light of the nature of the offense and the character of the offender."  When reviewing a sentence, our principal role is to leaven the outliers rather than necessarily achieve what is perceived as the correct result in each case.  *Cardwell v. State*, 895 N.E.2d 1219, 1225 (Ind. 2008). "We do not look to determine if the sentence was appropriate; instead we look to make sure the sentence was not inappropriate."  *Conley v. State*, 972 N.E.2d 864, 876 (Ind. 2012).  "[S]entencing is principally a discretionary function in which the trial court's judgment should receive considerable deference." *Cardwell*, 895 N.E.2d at 1222.  "Such deference should prevail unless overcome by compelling evidence portraying in a positive light the nature of the offense (such as accompanied by restraint, regard, and lack of brutality) and the defendant's character (such as substantial virtuous traits or persistent examples of good character)."  *Stephenson v. State*, 29 N.E.3d 111, 122 (Ind. 2015).  In conducting our review, we may consider all aspects of the penal consequences imposed by the trial court in sentencing, i.e., whether it consists of executed time, probation, suspension, home detention, or placement in community corrections, and whether the sentences run concurrently or consecutively. *Davidson v. State*, 926 N.E.2d 1023, 1025 (Ind. 2010).  In addition, as we assess the nature of the offense and character of the offender, "we may look to any

factors appearing in the record." *Boling v. State*, 982 N.E.2d 1055, 1060 (Ind. Ct. App. 2013). Sexton has the burden to show that her sentence is inappropriate. *Anglemyer v. State*, 868 N.E.2d 482, 490 (Ind. 2007), *clarified on reh'g* 875 N.E.2d 218.

[20] Turning first to the nature of the offenses, we observe that "the advisory sentence is the starting point the Legislature selected as appropriate for the crime committed." *Pierce v. State*, 949 N.E.2d 349, 352 (Ind. 2011). Sexton was convicted of possession of methamphetamine as a level 3 felony because she possessed at least twenty-eight grams of methamphetamine. Ind. Code § 35-48-4-6.1(d). The advisory sentence for a level 3 felony is nine years, with a range of three to sixteen years. Ind. Code § 35-50-2-5. Sexton was given three years above the advisory. However, the trial court demonstrated leniency by suspending three years and imposing a concurrent sentence for Sexton's conviction for class A misdemeanor possession of a schedule II controlled substance. We observe that Sexton had two bags of methamphetamine, one with 28.18 grams and the other with 1.79 grams. In addition, she had a digital scale, which suggests that she did not merely possess methamphetamine but was dealing it. She illegally possessed more than one kind of drug, and there was evidence of synthetic marijuana for which she was not charged. She misled Officer Clere about her last name and denied knowledge of the methamphetamine in the pockets of her jacket even though she had put her hands in her pockets. These facts as to the nature of her crimes support a sentence above the advisory.

[21] As to Sexton's character, she has two previous arrests as a juvenile for the status offense of incorrigibility and one for being a runaway. As a twenty-five-year-old adult, she has previous convictions for class B misdemeanor leaving the scene of an accident and class A misdemeanor domestic battery in two separate causes. She was on probation for these two offenses when she committed the instant crimes. She violated her probation several times and failed to appear at least five times. She also failed to appear in this case and admitted that she failed to appear at trial because she was using methamphetamine instead. After committing the instant offenses, she was arrested for two counts of resisting law enforcement and false informing. Her past and current criminal conduct indicate a disrespect for the law. Prior leniency has clearly not influenced her behavior. She is classified in the high risk category to reoffend.

[22] Sexton argues that she is a drug addict, whose drug use has coincided with her criminal activity, not a hardened criminal. We observe that her drug use has gotten progressively worse to the point where she is using methamphetamine every day and marijuana every other day. Tr. Vol. 3 at 70. Previous opportunities for substance abuse treatment have proven unsuccessful. Sexton does not suggest that incarceration will prevent her from receiving treatment for her addiction issues, and in fact, it may present the best options for inpatient treatment.

[23] Sexton also misled the trial court at sentencing by stating that she had "never been in trouble before." *Id*. at 78. She has four children, none of whom she has custody of and none of whom she supports financially. Although she stated

that she had been previously employed at two different businesses and claimed that she could get either job back, she had been unemployed for two months prior to her arrest in this case. *Id.* at 70. We conclude that Sexton has failed to carry her burden to show that her sentence is inappropriate in light of the nature of the offenses and her character. Therefore, we affirm her sentence.

[24] Affirmed.

Najam, J., and Pyle, J., concur.